United States Court of Appeals
Fifth Circuit

**F I L E D**

July 21, 2006

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-70049
_____

MICHAEL DURWOOD GRIFFITH,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

On Appeal from the United States District Court
for the Southern District of Texas
Houston Division
No. 4:04-CV-04109

Before JONES, Chief Judge, and WIENER and DEMOSS, Circuit Judges.

PER CURIAM:[*]

Petitioner Michael Durwood Griffith was convicted and sentenced to death in Texas state court for murdering Deborah McCormick while attempting to rob her. After he exhausted state remedies, Griffith sought a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied relief and refused to grant a certificate of appealability ("COA"). Griffith now requests a COA on three issues: 1) whether the trial court's admission of FBI

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Special Agent Alan Brantley's expert testimony violated the Eighth Amendment; 2) whether the trial court's denial of Griffith's request to provide additional expert assistance violated due process or the Sixth Amendment; and 3) whether Billy Ringer, Jr.'s victim impact testimony violated due process. Because no reasonable jurist could find the district court's resolution of these issues debatable or conclude that Griffith's arguments deserve to proceed further, we deny the request for a COA on all issues.

## I. BACKGROUND

Griffith's guilt is not at issue in this appeal. The jury convicted him of capital murder for stabbing Debra McCormick multiple times after he sexually assaulted and robbed her. During the penalty phase, the State proved that Griffith 1) was a former Sheriff's Deputy; 2) had a poor reputation for being peaceful and law-abiding; 3) had a volatile temper; 4) was fired from the Sheriff's Department following a misdemeanor conviction for domestic abuse; 5) was angry, physically and verbally abusive, and extremely possessive and controlling toward two ex-wives and two ex-girlfriends; and 6) was violent with his children. The State also demonstrated that Griffith had committed a bank robbery in which he shot a teller in the back of the head, and a bridal shop robbery during which he sexually assaulted a sales clerk.

2

The defense countered that Griffith's mother had a drinking problem, was often angry and violent when drunk, and favored his brother. Further, Griffith received numerous professional awards, as well as praise from supervisors and people in the community. Griffith's former coworkers testified that Griffith was highly competent and professional, and a compassionate supervisor and friend, and that he was devastated after being fired.

Both the defense and the State introduced evidence regarding Griffith's future dangerousness. The defense presented testimony from Dr. Toby Meyers, Dr. Edward Friechman, Dr. David Hopkinson, and Dr. Mitch Young. Dr. Meyers, the director of a program for people who have engaged in violence against an intimate partner, testified that he had worked with Griffith in the past, that Griffith had acknowledged that he had a problem as a domestic abuser, and that Griffith worked diligently in the group and benefitted from the experience.

Dr. Friechman, a clinical psychologist, testified that Griffith had borderline personality disorder and/or dissociative disorder. He noted that Griffith's violence toward his wives and girlfriends was triggered by actions that reminded him of his neglectful mother. He also opined that Griffith's identity had been connected to his job as a law enforcement officer, that his job was the "glue" that held him together emotionally, and that when he lost his job, his sense of reality became chaotic,

3

resulting in intense anger. Friechman further opined that the structure of prison life would serve as a "glue" for Griffith, although he conceded that Griffith would be dangerous if he ever escaped. Dr. Hopkinson's testimony was similar.

Dr. Young, a psychiatrist, also diagnosed Griffith as exhibiting borderline personality disorder, and opined that as long as Griffith was in a structured environment, he would function normally. If he had no contact with women, Griffith would not be dangerous in prison.

In rebuttal, the State called Allan Brantley, a Special Agent at the FBI's National Center for the Analysis of Violent Crime. After analyzing Griffith's background and crimes, Brantley concluded that Griffith's actions were motivated by his sexual drive. Brantley also noted that such sexual drives do not go away, and therefore there was a high probability that Griffith would engage in future acts of violence. Brantley compared Griffith to a sexual predator, and concluded that, if isolated from females, Griffith would look for similar victims within the available population, which could include weaker males. Additionally, Brantley noted that prisoners encounter women and children within prison systems.

Finally, the State called Billy Ringer, Jr., the brother of Debra McCormick, to testify. Ringer, Jr. had a close relationship with his sister. At one time, she worked for him at his medical practice and was much-loved by all his patients.

4

McCormick and her mother, Mary Jane Ringer, were also very close; the two enjoyed running the family business together. Ringer, Jr. said that McCormick's death adversely affected their father, Billy Ringer, Sr.; McCormick was the heart of the family who planned birthday, holiday, and family events; and she was a good Christian. Ringer, Jr. added his belief that, because of his sister's death, their father gave up his fight against cancer and passed away.

The jury found that, if sentenced to life imprisonment, Griffith would constitute a continuing threat to society, and that the mitigating evidence was not sufficient to justify a life sentence. The judge then sentenced Griffith to death. The Texas Court of Criminal Appeals affirmed Griffith's conviction and sentence, Griffith v. State, 983 S.W.2d 282 (Tex. Crim. App. 1998), and denied Griffith's petition for a writ of habeas corpus. Ex Parte Griffith, No. 56,987-01 (Tex. Crim. App. Oct. 8, 2003). Griffith's subsequent federal petition for writ of habeas corpus also was denied. Griffith v. Dretke, 2005 WL 2372044, at *9 (S.D. Tex. Sept. 27, 2005).

## II. DISCUSSION

To obtain a COA under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs this case, Griffith must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003). Thus,

5

he "must demonstrate that reasonable jurists could find the district court's resolution of his constitutional claims debatable or that reasonable jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." Martinez v. Dretke, 404 F.3d 878, 884 (5th Cir. 2005) (citing Miller-El, 537 U.S. at 336, 123 S. Ct. at 1039). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. Rather, it only "requires an overview of the claims in the habeas petition and a general assessment of their merits." Id. Nevertheless, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [the defendant's] favor." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000).

Against these background criteria, we address each of Griffith's issues.

### A. The admission of Brantley's expert testimony

Griffith argues that FBI Special Agent Allan Brantley's testimony during the penalty phase of Griffith's trial violated his Eighth and Fourteenth Amendment rights. Griffith contends that, by associating him with homosexual conduct, the State created a substantial danger that the jury would use the testimony to conclude that he would be a future danger simply because they find such conduct morally reprehensible. The district court determined

that this claim was procedurally defaulted because Griffith had not presented it to the state courts.

AEDPA requires that a habeas petitioner exhaust available state remedies before raising a claim in a federal habeas petition. See 28 U.S.C. § 2254(b)(1). To exhaust state remedies, a petitioner "must have fairly presented the substance of his claim to the state courts." Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997). "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 277 (1982) (internal citation omitted). Therefore, the exhaustion requirement is not satisfied "where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court." Vela v. Estelle, 708 F.2d 954, 958 n.5 (5th Cir. 1983).

On direct appeal in state court, Griffith relied upon Rule 702 of the Texas Rules of Evidence and Aguilar v. State, 887 S.W.2d 27 (Tex. Crim. App. 1994), to argue that Brantley's testimony was not reliable and would not assist the jury in deciding the future dangerousness issue because Brantley could offer no more expertise in deciding the issue than the jury already possessed on its own. This is not the issue Griffith raised in the district court. For the first time, Griffith contended that the State violated his rights because, by associating him with homosexual conduct, the State created a substantial danger that the

7

jury would use the testimony to find Griffith would be a future danger simply because it found such conduct morally reprehensible. We agree with the district court that Griffith did not fairly present the substance of this claim to the state courts, and that it was procedurally defaulted. Reasonable jurists could not debate the district court's resolution of this claim.

Additionally, the district court dismissed Griffith's unexhausted claim with prejudice because it determined that, on the merits, pursuing the claim in the state forum would be futile. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Griffith contends that Brantley's testimony invited the jury to impose a death sentence based on lawful conduct, and therefore, in light of Lawrence v. Texas, 539 U.S. 558, 123 S. Ct. 2472 (2003), violated his Eighth Amendment rights. The district court noted that Brantley never implied that Griffith should be sentenced to death because he was homosexual; rather, Brantley testified that Griffith would present a threat to the prison population because he is a sexual predator who, in the absence of women, would sexually assault weaker fellow inmates. The district court determined that it was the likelihood of sexual assault, not the fact that the victim of the assault may be the same sex, that was the subject of Brantley's testimony. Accordingly, the court

8

found that Griffith's argument was without merit, and thus dismissed it with prejudice.

Brantley's testimony was relevant to the future dangerousness special issue. The Eighth and Fourteenth Amendments require that a jury "must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." Jurek v. Texas, 428 U.S. 262, 271, 96 S. Ct. 2950, 2956 (1976). In Dawson v. Delaware, 503 U.S. 159, 112 S. Ct. 1093 (1992), the Supreme Court "emphasiz[ed] that 'the sentencing authority has always been free to consider a wide range of relevant material.'" Id. at 164, 112 S. Ct. at 1097 (citing Payne v. Tennessee, 501 U.S. 808, 820-21, 111 S. Ct. 2597, 2606 (1991)). Furthermore, although it is well settled that the State may not limit consideration of any relevant mitigating circumstance, Payne, 501 U.S. at 824, 111 S. Ct. at 2608, neither is the State prevented from rebutting the mitigating evidence of the defendant. Dawson, 503 U.S. at 167, 112 S. Ct. at 1098-99. Thus, because defense experts hypothesized that Griffith would no longer present a future danger to society in prison because he would no longer have access to women, evidence that Griffith would continue to be a sexual predator regardless of the sex of the victim was certainly relevant to the issue of future dangerousness, and the State was entitled to offer such evidence. Furthermore, Brantley testified that Griffith was likely to encounter women and children inside the prison, indicating that, as

9

an incurable sexual predator, he was likely to have some opportunities to assault females and juveniles in addition to weaker male prisoners.

Reasonable jurists could not debate the district court's conclusion that this claim is both unexhausted and meritless, nor could they conclude that this issue is adequate to deserve encouragement to proceed further; therefore, we will not issue a COA. See Martinez, 404 F.3d at 884.

## B. Trial court's denial of additional expert assistance

Griffith next argues that the trial court violated his rights when it refused to fund Dr. Theodore Blau as an expert witness. Griffith contends that the court's refusal violated his due process, confrontation, and effective assistance of counsel rights. Griffith asserts that, without the appointment of Dr. Blau, he was unable to cross-examine Brantley or rebut Brantley's testimony with defense expert testimony.

The Texas Court of Criminal Appeals set forth the facts relevant to this issue in its opinion on direct appeal:

> [A]ppellant filed a motion on November 1, 1995, requesting the appointment of psychiatrist Mitchell Young and psychologist Ed Friedman. The trial court granted this request, but limited the funds available to $6,000.00. According to Dr. Young's letter to defense counsel, psychologist David Hopkinson would also be helping with the case. On November 22, 1995, appellant filed two additional motions requesting the appointment of "expert assistance." Each of these motions specifically asked for the appointment of psychologist Dr. Theodore Blau. Appellant urged his motion be granted because Blau was needed to respond to State's expert, FBI

10

Special Agent Dr. Allan Brantley, who was going to use a "threat assessment technique" (apparently similar to a future dangerousness analysis) and "compare the defendant to profiles of certain serial killers and discuss [appellant's] similarity to such individuals." Blau was apparently needed to show why such testimony was not "scientifically validated" and should, therefore, be held inadmissible. No affidavits or other evidence of need were included with the motion.

In considering the motion prior to trial, the trial judge asked appellant whether, if she granted his motion and appointed Blau, Blau was going to listen to Brantley's testimony. Appellant responded that he did not think so. The judge also asked appellant why one of the psychologists or the psychiatrist that had already been appointed could not rebut Brantley's testimony. Appellant responded that Brantley's testimony was not psychological in nature, but instead was based upon a forensic analysis. Appellant asserted that Blau was necessary because he was one of the people who developed the techniques about which Brantley would be testifying and he was the only non-FBI person counsel was aware of who utilized them. The judge overruled his request.

Prior to Brantley's testimony at punishment, the trial court held a hearing pursuant to Texas Rules of Criminal Evidence 702-705 to determine Brantley's qualifications and the bases for his testimony. Brantley told the judge that he was going to render an opinion on appellant's probability for being a future danger and that he was going to base that opinion upon crime scene photographs, investigative reports, interviews, autopsy photographs, school records, work records, and "everything that [he] could get [his] hands on." Brantley stated that he was not testifying from a psychological perspective per se, but rather from his experience in the criminal justice field. Brantley also told the judge that he did not intend to use the "profiling" technique of which appellant complained. Appellant challenged Brantley's testimony asserting that it was based on novel methodology and was cumulative because the State had established the same information through the cross-examination of appellant's experts. The judge held the testimony admissible.

Griffith v. Dretke, 983 S.W.2d 282, 285-86 (Tex. Crim. App. 1998).

11

## 1. Due Process

Although the trial court had already appointed three experts to assist Griffith — two psychologists and a psychiatrist — Griffith argues that these experts were insufficient because they did not have a law enforcement background; and the court was obliged to provide funding for a defense expert who was familiar with the basis for Brantley's testimony and could provide rebuttal.

An indigent defendant is entitled to funding for psychiatric expert assistance when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." Ake v. Oklahoma, 470 U.S. 68, 82-83 105 S. Ct. 1087, 1097 (1985). This circuit has extended this rule to apply to the assistance of nonpsychiatric experts where the evidence at issue is "both critical to the conviction and subject to varying expert opinion." Yohey v. Collins, 985 F.2d 222, 227 (5th Cir. 1993) (internal quotation marks omitted). However, an indigent defendant does not have an automatic right to expert assistance upon demand. See id. Rather, he must "establish a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial." Id.

The district court determined that Dr. Blau's assistance was not necessary because 1) the specific issue in which Blau is an expert, "profiling," did not come up in Brantley's testimony; and

2) the other defense experts could adequately rebut Brantley's testimony. Accordingly, essentially the same state court rulings were not unreasonable applications of clearly established federal law.

Griffith asserts that Dr. Blau was needed to combat Brantley's testimony involving a "profiling" technique. However, Brantley informed the trial court, prior to his testimony, that he would not be presenting testimony based upon the "profiling" technique, and the judge determined that Brantley did not rely upon profiling in forming his opinion. Additionally, Griffith argues that his three appointed experts could not adequately assist with the cross-examination or rebuttal of Brantley's testimony. Although Griffith complained that his experts were unfamiliar with Brantley's techniques, Brantley's opinion of future dangerousness was based upon his evaluation of the evidence. The defense experts also provided future dangerousness testimony based upon their evaluation of Griffith and the evidence. The experts' frames of reference and methodologies may have differed, but all of them relied to some extent on Griffith's prior conduct to predict his future propensity for violence; therefore, it is unclear why Griffith's expert testimony could not provide assistance in rebutting Brantley's testimony.

Finally, Griffith has failed to establish a reasonable probability that the court's denial of Dr. Blau's assistance resulted in a fundamentally unfair trial. See Yohey, 985 F.2d at

227. The trial court provided Griffith three experts; the State countered in rebuttal with one expert. The fact that Griffith did not have a fourth expert to rebut Brantley's testimony does not render his trial fundamentally unfair, given that three of the four experts who testified agreed that Griffith would not be a future danger in prison. Additionally, the State's case for future dangerousness, even without Brantley, was extremely strong: The facts of the crime were horrific and brutal; Griffith's former supervisor testified that Griffith had a bad reputation for being a peaceful and law abiding citizen, was prone to spontaneous eruptions, and was terminated from his job for domestic abuse; Griffith threatened and physically abused wives and girlfriends; and Griffith sexually assaulted one woman and shot another during the course of prior robberies.

### 2. Confrontation

Griffith next contends that the trial court's denial of funds for the appointment of Dr. Blau violated his Sixth Amendment right to confront Brantley. "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435 (1986)(quoting U.S. CONST. AMEND. VI). This right includes the right to cross-examination, but "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on

14

concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679, 106 S. Ct. at 1435.

This issue is meritless. The trial court did not prohibit cross-examination or inquiry into Brantley's techniques or methods for arriving at his conclusion. The record reflects that Griffith's counsel cross-examined Brantley thoroughly. The district court also determined, as noted supra, that Dr. Blau "had nothing relevant to offer that could not be presented through the testimony of Griffith's other . . . experts." Griffith v. Dretke, 2005 WL 2372044, at *9 (S.D. Tex. Sept. 27, 2005).

In light of the lack of relevance of Dr. Blau's proposed testimony on "profiling," Griffith's admission that Dr. Blau was not going to be present during Brantley's cross-examination, and the extensiveness of the cross-examination of Brantley, reasonable jurists could not debate the district court's conclusion that Griffith's Sixth Amendment right to confront Brantley was not violated by the trial court's denial of funds for the appointment of Dr. Blau.

### 3. Effective Assistance

Griffith next attempts to reargue his expert assistance claim under the guise of a Strickland claim. Griffith contends that the trial court's refusal to appoint Dr. Blau rendered defense

15

counsel ineffective and prejudiced Griffith because counsel was unable to adequately prepare for the punishment phase or cross-examine Brantley.

To establish a violation of the Sixth Amendment right to counsel, Griffith must show that his counsel's representation was deficient, and the deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The district court found that Griffith could not meet Strickland's requirements for his ineffective assistance of counsel claim because Dr. Blau's testimony presented nothing relevant that Griffith's other psychological experts could not address. Griffith, 2005 WL 2372044, at *9.

Although Griffith claims ineffective assistance of counsel, he sets forth no act or omission on the part of trial counsel that rendered his assistance ineffective. In fact, his counsel made every effort to obtain Dr. Blau's assistance and to prevent or discredit Brantley's testimony. Counsel moved twice for the appointment of Dr. Blau, setting forth reasons why his assistance was necessary; counsel objected to the admission of Brantley's testimony in a hearing pursuant to Rules 702-05 of the Texas Rules of Criminal Evidence; and counsel extensively cross-examined Brantley. Therefore, in the absence of any deficiency by counsel, or any prejudice caused by a deficiency, Griffith cannot make a prima facie case under Strickland. Reasonable jurists could not debate the district court's resolution of this claim. No COA

16

is appropriate for Griffith's claims relating to the trial court's refusal to appoint Dr. Blau as an expert.

## C. Billy Ringer Jr.'s victim impact testimony

Finally, Griffith argues that the victim impact testimony of Billy Ringer, Jr., McCormick's brother, violated the Due Process Clause. Specifically, Griffith objects to Ringer, Jr.'s statement that the victim's death caused their father, Billy Ringer, Sr., to lose his will to live; he believes the jurors punished him for the death of Ringer, Sr. The Supreme Court has held that the Eighth Amendment does not bar the admission of victim impact testimony. Payne, 501 U.S. at 827, 111 S. Ct. at 2609. However, if the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id. at 824, 111 S. Ct. at 2608.

Griffith contends that Ringer, Jr.'s testimony was false and therefore unduly prejudicial. Griffith's only support for his proposition is citations to medical journals for generic examples of the typical low survival rates for people with the type of cancer Ringer, Sr. suffered from. Ringer, Jr., however, testified simply that his father showed progress before Deborah's murder but stopped eating on news of the murder and died shortly thereafter. The district court found that there was no evidence that Ringer, Jr.'s testimony was false or misleading, and therefore determined

17

that it was admissible under <u>Payne</u>.  <u>Griffith</u>, 2005 WL 2372044, at *9.

Griffith also contends that after hearing Ringer, Jr.'s testimony, the jurors punished him not only for the death of McCormick, but for the death of her father as well.  But as the district court held, Ringer, Jr.'s testimony was not so emotionally charged as to make it inadmissible under <u>Payne</u>.  The case presented by the prosecution supports the district court's conclusion.  Ringer, Jr. was the only witness to provide victim impact testimony.  Furthermore, the prosecution made only one passing reference to that testimony in closing arguments, focusing instead on the brutal facts of the crime, Griffith's brutal attacks on other women, the numerous threats and physical abuse Griffith inflicted upon his wives and girlfriends, the other evidence admitted at punishment, and the jury charge.  Reasonable jurists could not debate the district court's resolution of this claim, and could not conclude that the issues presented are adequate to deserve encouragement to proceed further; thus we will not grant a COA.  <u>See</u> <u>Martinez</u>, 404 F.3d at 884.

## III.  CONCLUSION

For the reasons discussed above, we deny Griffith's request for a COA on all claims and as such lack jurisdiction to review the district court's denial of habeas relief on these claims.  <u>See</u> <u>Miller-El</u>, 537 U.S. at 335-36, 123 S. Ct. at 1039.

18

**COA DENIED.**